Good afternoon, everyone. The first case this afternoon is number 2007-1490, Minks v. Polaris Industries. Mr. Hill. May it please the Court, Mr. McHale, for you to call Floyd Minks and then my time submitted. But I have to tell you, as someone who doesn't come to D.C. as much as they should, it's more than a little humbling to appear before you. I appreciate it. Mr. Hill, you'll help me if you'll speak up. Yes, sir. Thank you. We're here seeking reinstatement of a jury verdict. In the case below, the District Court reduced a jury verdict, the amount of $1.3 million, to a mere $27,000. The fact that that was done and couched as a constitutional reduction is especially troubling in this case because that causes the District Court to not follow the standard law that's well established in permitting jury verdicts to offer the plaintiff the option of a new trial. Well, you've got an 11th Circuit case that seems to condone that activity. What's your comment about that? Yes, sir. The Johanson case and also the Tronso case from this Court talk about… Let's come to that second. Deal with your 11th Circuit case. …dealing with specific items that a court can find do not apply. There's no authority that we've found, especially Johanson, for the court to say, all right, we are conceding that a reasonable royalty could be awarded. However, because we don't like the amount awarded by the jury, we are now going to remit it on a constitutional basis, thereby denying you the right for the option of a new trial. So Johanson doesn't talk about a judge reweighing evidence or finding that an item of damage can be awarded but not in that specific amount. The Tronso and the Johanson case talk about impunitive damages context, as the BMW case. There are certain constitutional limits, but there's no authority that we're aware of, and there certainly isn't under Johanson, Tronso, or BMW, for the judge to take an item of damage that was considered and awarded by the jury and then simply substitute its own judgment and use that under the guise of a constitution in order to avoid the remitter law that's, well, for hundreds of years, the law of remitter has been you have to afford the plaintiff the option of a new trial. Is there a constitutional right, though, of a new trial in lieu of a remitter? Judge, and this was pointed out in the briefs, the irony of the constitutional remitter is that the Seventh Amendment of the Constitution provides that the right to a trial by jury shall be preserved. So to, again, deny someone the right by a trial by jury under the guise of the Constitution seems rather ironic, at least based upon the case law. But you're not requesting a remand for another trial of damages, are you? I have the impression that the only relief you were asking us for was to reinstate the jury verdict. No, I'm sorry, Your Honor. We're in the alternative. We are requesting, first and foremost, the reinstatement of the jury verdict. If for some reason this court finds that the jury verdict was indeed not supported, the $1.3 million was not supported by any substantial evidence, we would challenge the court's constitutional reduction and ask that it be remanded for a new trial of damages in that it was actually a remitter, not the so-called constitutional reduction. And as to the first point, we would say there was ample evidence that was, even in the judge's order, was considered and weighed and disregarded as far as the propriety of the $1.3 million jury award. Well, the trial judge kept telling you—did you handle the case at the trial? Yes, sir. The trial judge kept telling you, as I read the record, that your damages evidence is sloppy—I'll paraphrase—unconvincing, no theory, you better get your act together. Am I correct that that seemed to be the way the trial judge viewed your evidence on damages, and yet you all never did a thing to help yourselves? Judge— What is it that the trial judge could do other than hold you in contempt? What more could the trial judge have done to get you to put on a decent damages case that would support a jury award? Judge, and counsel has done a nice job of developing the—his quote was economic nonsense, if that's where we're headed. Let's get right to it. If you look at that quote in the context of the record, and it's on Appendix 28, 83, and 84, the judge's first comment on his theory that it was economic nonsense was based upon the fact that Mr. Minks, at trial, was claiming a royalty that was more than the component price that contained the patented technology. He simply did not see how that could make any economic sense. And if you read that—from that comment on, that is when my co-counsel described how you have entire market value rule, you have convoy sales, you consider those factors under Georgia-Pacific. And if you look at that, the judge's first quote was, well, then you must have some monopolistic tying agreement. Are you saying that we have an antitrust problem here because we have a tying arrangement between patented and unpatented products? So—and if you read further, you'll see that he was vaguely aware of the Georgia-Pacific factors and maybe aware of the entire market value rule, but didn't realize that that is a real consideration in patent cases, that it's viable theory of recovery for a reasonable royalty. So, yes, sir, I agree that he did make those comments, but I would submit to you that if you read that quote and read the initial ruling from the court, he had already prejudged this evidence, Your Honors. And that's what I think is apparent from his ruling as well as the constitutional level of his reduction. If you read the record, he—this was in the middle of the plaintiff's submission of testimony. The plaintiff hadn't even closed their evidence, and the judge is saying, I don't buy it. Economic nonsense, I'm not going to buy it. Yes, it's foreshadowing, but again, Judge, if we believe that the rule of law supports our damage theory to change in the middle of trial to satisfy a comment by the judge that didn't appear to be based upon the sound case that they were aware of, yes, to the extent you think maybe we should have, I'll fall on my sword for that, but I would submit to you that it's absolutely supported by Georgia-Pacific and the entire market value rule. The case law that he seemed to rely on was your 11th Circuit Johansson case. Yes, sir, and that's—the problem with the 11th Circuit Johansson case is that under the constitutional reduction standard, there is a prohibition on the district court reweighing the evidence and substituting its own version of the evidence, and that's exactly what happened in this case. The judge applied a 4% royalty— Well, what kind of cases should the Johansson case apply to if it doesn't apply to this case? Judge, that's an interesting question. It's applied in the punitive damage context for BMW. It was applied in the Tronzo case where the court found that there was no evidence that would support a specific element of damage, so that one element was completely wiped off. There's no support, and it would be rather frightening for this court to hold, that you can say, well, there are damages that are awardable for this element, but we think that's too much, so we're going to reduce it to what we think is right. That sounds an awful lot like a remitter, Judge, if you think about— What was wrong with reducing it to 4%? Judge, the 4%, there was evidence of, first of all, the constitutional reduction can only go to the maximum that was potentially awardable. The 4% was only one royalty rate that was introduced at trial, and that 4% also applied to all sales, not just patented sales. In other words, Mr. Minx had an internal agreement with his own family health company where it started off as 20% on patented-only products, went down to 10% on patented-only products, and then for ease so they didn't have to figure out what was patented and what wasn't, it was a 4% royalty on all sales. What the judge did in this case is apply that 4% royalty on all sales to only patented sales, so he even gave Polaris a better deal than Mr. Minx gave his own company. But the 4% was, in fact, and trying to see where the 4% comes from, there it is, that's what the company, Minx Engineering, pays to the inventor. But the company wasn't a party to this case, was it? So in looking to see where the reasonable royalty, if the plaintiff receives only 4%, whatever the damage and the injury to his assignee, was that before the district court, the assignee wasn't a party? Yes, Your Honor. And there's evidence, and first of all, the 4%, I don't even believe it's argued, and it wasn't contested in any of the briefs, that that would be an established royalty of any sort. If that was argued, it would be inappropriate because the case law is clear that an internal agreement that one has, an inventor has with his own company, would not be an established royalty. But that also included non-patented income. Yes, sir. Now, where in the record does it show that you sold anything beyond the $6.11 for the item? Your Honor, in the first brief I can provide you the site on Roboto, there was evidence of the $6.11. There was also testimony by Mr. Minx that the range was $6 to $10 as far as the, I don't have a note there, I'll try to get you that site on Roboto, as far as the patented product itself. There was also ample evidence as far as the relationship between this patented component, which was the reverse speed limiter, and the fact that it had to work in conjunction with voltage regulators, hub speed controls. And in fact, Mr. Minx provided testimony that he didn't believe that this patented component had ever been sold to Polaris when it wasn't actually combined into a package assembly. So under right height and paper converting, clearly it satisfies the entire market value rule as to whether those sales could also be considered in the royalty rule. But going back to the rates themselves, if we're going to find the constitutional reduction to be proper, you have to find that that 4% that was supposed to be applied to all sales, that the judge decided to apply to only patented sales, was the maximum that could have been allowed. But that's all, this is what I was asking before, and I keep coming back to it because I don't understand it. If all that Mr. Minx was getting was 4% maximum, he's the plaintiff. Yes, ma'am. What difference does it make? How much was lost by the company? Your Honor, there's testimony that we've also cited in the initial brief from Mr. Minx that he received much more compensation than simply the 4%. Yes, I saw that, but those were intangibles and it wasn't employed other members of the family and so on. The whole thing was about royalties and the direct payments for these products. And if, in fact, you're saying that the jury would have measured the damages that they did assess in view of the other less than tangible compensations to members of the family and so on, that's quite a different theory than the selling price and the lost profits and the lost business and all the rest of it. All of which, as far as I can tell, was a claim of the corporation, not the inventor. Your Honor, I would respectfully submit that that is why, the very reason why that 4% royalty is not binding, is the same reason that this Court finds that that's not an established royalty. That if the patent holder cuts a sweetheart deal with his own company, that shouldn't be held against you as far as what is available in the market and what is a reasonable royalty in the market, especially in light of Mr. Minx's testimony that there was additional compensation. A patent holder who is involved in the company has many business interests that would be involved in allowing the company to make a profit as well. If you're talking about what Polaris would get, Polaris got a better deal from the Trump Court than Mr. Minx gave his own company. You obviously did very well in front of the jury. I take it this was a general verdict. Yes, sir. And they gave you damages of $1,294,620.91. Yes, sir. Do we have any idea how the jury arrived at that number? No, Your Honor, and many times we don't know. The most obvious... The $0.91 is what's troubling me. Yeah, I don't... I don't understand how they got there. Your Honor, and that's one of the troubles. Well, tell me how they got to the $0.91. We never know how the jury specifically put pen to paper. We give them the intangibles of the hypothetical negotiation between the willing license holder... You didn't present numbers as such that would have added up to... I didn't give them $0.91, Your Honor. I didn't go past the decimal point. But if you want to take the most obvious way... I'm just trying to understand what happened. This patent was the subject of a negotiation in 1997 where Polaris wanted to have a license. Mr. Minks said no, but I'll take the business instead. Polaris awarded $7 million in business, resulting in $3.5 million in profit to Mr. Minks' family company. So if you want to know how the jury got there... Did they prorate the value of what the parties actually agreed to? Not a mythical or hypothetical negotiation, an actual negotiation between the parties. Did they prorate it? Possibly. Did they find that the 20% rate applied to the $50 in total sales? $10? Okay. You're just speculating. So you didn't try and do that? I'm sorry? So you didn't try to reconstruct? I don't believe it's possible to reconstruct the jury verdict to the $0.91. I don't believe that that's the statement. Okay. Thank you, Mr. Hill. Mr. Bass. Good afternoon. May it please the Court. I'd like to spend a brief period of time on the damages issue, but spend the bulk of my time on the cross-appeal issue, which is infringement. Because, of course, if there is, as a matter of law, no infringement, which is our position, then the Court need not trouble itself with a consideration about a constitutional reduction, a Seventh Amendment, or any of those issues. On the other hand, if you lose on the infringement issue, isn't the damages issue of interest to you? Of course. Now, let me say first, in response to one of Judge Newman's questions, we submit that, as a matter of law, the only thing this Court could do would be to remand for a new trial or for the trial judge's consideration of a remittance. Do you agree that that's the proper thing for us to do? I don't think it's proper. Why not? Because this judge clearly did not say this jury verdict is excessive and beyond what a reasonable jury should be allowed to do. Well, by his very actions, he said that, didn't he? Pardon me, Your Honor? By his very actions, he's reduced an over-a-million-dollar judgment to $27,000. He did, but his rationale wasn't that it was excessive. It was that it was impermissible as a matter of law. Why was it impermissible? Because there was insufficient evidence of any rational economic theory to support anything other than 4% on $6.11. Well, since when does a rational economic theory have to underlie a jury verdict? If so, we would be returning jury verdicts all the time. We've pointed out the precedents in this court, which have said specifically that when it comes to patent damage cases, which are not personal injury cases, the patent damages which are controlled by statute, Section 284, require the presentation of economically sound as well as factually based. That isn't what the statute says. The statute says a reasonable royalty. I understand that, Judge. A reasonable royalty, according to our cases, is based on a fiction in many cases, a hypothetical willing grantor and a hypothetical willing grantee of a royalty deal that everybody acknowledges is purely hypothetical. What is the economic rationale beyond the fact that you say it's a hypothetical negotiation? Well, this court has recognized the tension between the hypothetical royalty and the prohibition on pure speculation. And we go with the first. Well, you do and you don't. You go with that, but you've also refused to allow royalty verdicts that are plainly unsupportable by any rational theory or by the evidence. Well, this one is, why isn't this perfectly supportable? There's evidence in the record that there was a negotiation between Mink and Polaris back in, what, 1997. Polaris wanted to have a license, and Mink said, No, I don't want to give you a license. Well, that's some evidence of the nature of what that negotiation might look like. There's certainly a good bit of evidence in the record, isn't there, about the money that Polaris was willing to pay Mink for a three-year hiatus? Wasn't that there was a $7 million deal worked out at some point? Two years for $7 million for the gross prices of all sorts of components, not the infringing component. That had nothing to do with reasonable royalty. Well, in fact, the jury might have considered that as evidence of what the parties were willing to discuss in terms of a negotiation for all of the things that were going on between them. There was all kinds of bits and pieces. Now, I agree with you that the trial judge didn't think all of this added up to a sound economic theory, but I'm not quite sure, to be perfectly honest with you, I'm not quite sure that that's the trial judge's concern once it goes to the jury. We have a jury verdict. I understand all of that. All I can say is that the Eleventh Circuit, as Your Honor asked in your very first question, and this court in Tromso both upheld the proposition that it is the province of the trial judge when he or she concludes that as a matter of law, the verdict cannot be sustained to reduce it. What verdict? The verdict that comes back from the jury. On what kind of damages? On any kind of damages. No, no, no, no, no, no, no. Johansen was what kind of a case? Well, I think the specific cases were limited to Thomson. What was the case? What was the damages issue in Johansen? Punitive. Punitive in Johansen, but not in Tromso. Can you cite me other than to our own Tromso case, which is a very interesting case? Can you help me find another case in which this notion of constitutional capping exists other than in the area of punitive damages in which there are no facts? No, but my time is fleeting, and let's get to the more important issue. Because if there is no infringement, you don't have to worry about any of that. Okay? Okay. Now, as a matter of law, there is no infringement in this case because this is a 112-6 case. It's a means plus function case. It is an electrical circuit case. The trial judge correctly pointed to the only circuit disclosed in the specification that meets the means plus function element of Claim 2C. That circuit, as a matter of undisputed fact, and simple electrical engineering theory, that again is undisputed, was a voltage-sensitive circuit. And that circuit was incapable, as a matter of fact, and necessarily as a matter of law, in being a frequency-sensing circuit. And equivalence thereof. And how do we know but that in the particular context of how these devices worked, that that was not an adequately supportable equivalent for the jury to have so determined? Two reasons are. What's critical in answering that question is, first, it has to be structurally equivalent, not functionally equivalent. It has to be the same function. It depends on what the means is. If the means is a step, then it's an equivalent step. So it really depends on what the means is, and you look and see what's in the specification to carry out that function. And you look for an equivalent. And if, in fact, it's not a structurally equivalent, you may then, in addition to 112.6, doesn't exclude access to the doctrine of equivalence. Well, that's a very difficult question I submit in this court's jurisprudence as to where the line is if there is one. There is one. There's a line between 112.6 equivalence and common law equivalence. Well, you know, we've said that 112.6 is not a matter of the doctrine of equivalence, that it's a matter of literal infringement only. And if you have a structural equivalent, then you still have literal infringement. Judge Newman, I recognize that. But the court also said in Ciumanatta that where in Ciumanatta the structure, which was a flat or rolling skid plate rather than a flat skid plate in that case, where that structure as a matter of law could not be a 112 equivalent because it performed as a matter of law in a substantially different way, then it could not be a DOE equivalent. If I remember, that case may have had some estoppels, some prosecution history or whatever. I don't think we have ever gone so far as to overturn the one body of precedent which has permitted review under the doctrine of equivalency of the functions that are subject to 112.6. That is true, Your Honor. You have never explicitly yelled that the price of a 112.6 plain formant is to limit the equivalence to the 112.6 statutory equivalent. I recognize that. I mean, does your argument to us now turn on that question? Not at all. Not at all. I hadn't thought so. Don't let us divert you. The more important point here is that in order to prove equivalence, the plaintiff under either literal infringement or DOE had to show what the structure of the accused product was, and the record is devoid of any iota of evidence as to what the structure in this case was. Are you confusing structural equivalence with equivalent structure? I wasn't aware that there was a distinction when it came to 112.6 or DOE. It had to be an equivalent structure, which means it has to be structurally equivalent, does it not? Well, you aren't aware then of Judge Lurie's dissent. Was it in Haslody dissent? Dissents are not the law. My point is that Judge Lurie is arguing your case, but he did it in dissent, which is he said what we've got to do is look at the exact structure, and in fact what we have to do is disassemble the described mechanism and look at the structure. But he did that in dissent, and that was based on the Ciminatta case. But our other cases say no, we don't have to do that. We look at the equivalent structure, not at the structural equivalent. You seem to be arguing that we have to look at the specific structure of this design. I don't think so, Your Honor, and I'm being misunderstood. Good, then clarify. Because the point that I'm making is the case law is clear, and it's legion, that when you're dealing with 112-6, you have to prove the identical function and equivalent structure. We all agree on that. Now, if we start from that proposition, the second element is the one at issue here, and the second element requires that there be some evidence of what the accused structure is. There's none in this case, absolutely none. If you review the testimony that Mr. Minks gave, all of his testimony goes to function. He testified repeatedly that a frequency-sensing circuit functions in the same way as a voltage-sensing circuit. That's not the issue. The issue is, is the structure either identical or equivalent? And you can't answer that question without telling the jury what the structure is. All of his circuit diagrams, and if you take a look in the appendix to the material cited by Mr. Hill, which is at pages A3690-92 and 3861-62, those are the only documents he put in evidence to show the accused device. They're wiring diagrams and they're schematics. All those diagrams do is tell you what goes on outside of the accused device. The accused device was a speedometer, and it is never shown, it is never testified to, it is never described as to what the circuit was within that speedometer. So it's a case of no evidence of the infringing structure. You don't really have to get, I think, into the fine points of structural equivalent versus equivalent structure or what degree of proof is required when there is no proof whatsoever. But even if there had been some evidence of what the actual circuit was, we submit as a matter of law, just as in Shumanata, just as in Valpar and Industries, that as a matter of law, as a matter of electrical engineering, a frequency-sensing circuit cannot be the structural equivalent of a voltage-sensing circuit under this patent where there was no disclosure of any circuit except a voltage-sensing circuit. What about column 5 of the patent, which specifically goes to the issue of both lead B, point B? It should be noted that this control lead is neither the primary input voltage or frequency lead, point B, under primary ignition, turn off the lead, point C. Is there an equivalence there? There was no dispute about that particular point in the circuit. It was external to the circuit. What is the dispute then? What we dispute is whether there was any evidence of what went on, what the circuit was, that acted on the input that came to that particular point. The accused circuit. The accused circuit. There was no dispute that the accused circuit functioned to measure frequency rather than to measure voltage. That's conceivable.  It could all be a 112.6 or a DOE equivalent because of the claim in this case. Even though the claim could be covered with both voltage and frequency? This claim couldn't. Where is that limitation in the claim that says no, you can't do it? In the structure. Where specifically in the claim does it state that? Well, in the claim, what it says, it's in element 2C of the claim. I've turned it in the OAO back. This is at column 5 in line 52. I'm sorry, line 62. Means for providing set control signal responsive to direct current voltage input to thereby selectively inhibit ignition responsive to the speed of set engine. It's a long-winded means plus function claim, but it was construed by the judge without dispute here in this court to mean specifically the circuit shown in figure 2 of the OAO path, which is back on the end of page 38 of the OAO path. That's the structure, the circuit. And that's the structure as to which there was no evidence in this record whatsoever of the Polaris structure in either of the two accused speedometers. If I could reserve the balance. Okay. Yes, we will save you enough rebuttal time if we get to the cross appeal. Thank you. Okay. Mr. Hill? Yes, Your Honor. Just briefly on the structural issue, I've got about two minutes. There is evidence as far as the structures, and I've cited that in the briefs there, in the yellow brief 2856 through 63 and 3861 through 93. Mr. Meeks specifically took the schematics of the infringing device and superimposed exactly what structure from claim 2 of the OAO patent would relate to what specific structures in the infringing device. I don't know how much more detail you can get. There's a contention in the brief that that doesn't deal with structure, but if the schematics don't deal with structure, I'm hard-pressed to figure out what exactly would. Your Honor, you're exactly right. The Odetics dissent from Judge Laurie talks about the component-by-component analysis, but that has been rejected by this court three times, in the Odetics case, in the IMS case, and in the Caterpillar case. So the court has said that to look to a component-by-component basis and say, well, you'd have to change this component so it can't possibly be an equivalent, that's just wrong, and it seems to have turned the concept on its head. As the Caterpillar case recognized, the standard is on the equivalents, is there known interchangeability? And, Your Honor, there was incredible evidence presented as to that fact. In fact, Mr. Minks cited prior patents that are referenced by the patent examiner in this case that showed frequency-sensitive units that would correspond to this infringing unit. He also said that it was known within the industry, within the field, that you could sense either. And, Your Honor, you correctly noted one of the portions. There's another portion on column 2 of the patent, line 12, and this relates to claim 2A, which talks about the electrical input. There's two voltages. There's the input voltage that lets you determine engine speed, and then there's the DC voltage, which is specifically the only voltage that's referenced in claim 2A. This talks about, as far as the input, it can be either the frequency or the voltage, either one. Mr. Minks testified almost ad nauseam that either one and both were used in the industry. And, Your Honors, I'm sorry I'm out of time. Any more questions for Mr. Hill? No, ma'am. Okay. Thank you, Mr. Hill. Mr. Bass, on the cross-appeal issue. On the cross-appeal issue, if the court will look at addendum page 45 to the writ brief, this case fits about a mile as a hand does a glove. Don't mean to be trite, but it does. And that is because Mr. Minks himself, in his 924 patent, said that the circuit in the 924 has appreciable better accuracy than the circuit in the 080, since it, the 924, senses the frequency and not the voltage of the alternator. That's part of the same family of patents. He claims the same antecedents. That's a subsequent statement by the inventor limiting his own patent, which the Valmont Industries case relied on, in part, in concluding, as a matter of law, that there could not be equivalence in that case. And let me just point the court... What pages were you reading from, Mr. Bass? Addendum to the writ brief, 45, it's column 4, beginning at line 5, of the 924 patent. One of Mr. Minks' other patents that he referred to at trial as one of his frequency-sensing patents. Now, if I could refer, in the 112 context, to the court's recent decision in Aristocrat. Aristocrat was a plain construction case involving a slot machine, while the holding of that case was that computer programs must disclose the algorithm or the program structure, and not just what it does. The principle that that case stands for is that the price of a 112-6 claiming format is to limit the claimant to the structure disclosed. And that the principle that overall guides both claim construction and resubmitted infringement in 112-6 cases is that you cannot allow either the claim construction or the infringement analysis to, in essence, sweep into 112-6 claims functional equivalency alone. That there must be structural equivalency, which is absent in this case. This is for questions that rely on the briefs for the other issues, including the Seagate issue that we've not discussed all over here today. Okay. Thank you, Mr. Bass. And thank you, Mr. Hill. The case was taken into submission.